UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

VARIBLEND DUAL DISPENSING SYSTEMS, LLC,

                                    Plaintiff,                      13 Civ. 2597 (PAE)

                      -v-                                  OPINION & ORDER

SEIDEL GMBH & CO., KG,

                                   Defendant.

------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

       Plaintiff Variblend Dual Dispensing Systems, LLC ("Variblend") sues defendant Seidel GmbH & Co. KG ("Seidel") for alleged tortious conduct regarding proprietary trade secrets previously licensed to Seidel by Innopump, Inc., d/b/a Versadial ("Versadial"), a non-party to this action.  Variblend alleges that it is the assignee of Versadial's rights under its agreement with Seidel.  Seidel moves to dismiss this action and to compel arbitration in Geneva, Switzerland, in accordance with the arbitration provision contained in the agreement between Versadial and Seidel.  For the following reasons, Seidel's motion to compel arbitration, under the terms of the agreement between Versadial and Seidel, is granted; and this action is stayed pending the outcome of that arbitration.

**I.     Background**

   **A.  Facts**[1]

      **1.     The Parties**

Versadial is a Nevada corporation with its principal place of business in New York, New York.  Stipulation ¶ 1.  Seidel is a German company with its principal place of business in Marburg, Germany.  *Id.*  Variblend is a Delaware limited liability company with its principal place of business in Montvale, New Jersey.  *Id.*

      **2.     The Agreement**

On September 20, 2006, Versadial entered into a Manufacturing Agreement (the "Agreement") (Stipulation Ex. 1) with Seidel.  *Id.* ¶ 2.  On October 2, 2008, the two parties entered into Amendment No. 1 to the Manufacturing Agreement ("Amendment No. 1") (Stipulation Ex. 2).

The Agreement provided for Seidel to manufacture for Versadial components (called "sub-assemblies") of an invention to which Versadial possessed the exclusive rights.  *See* Agreement; Compl. ¶ 13.  That invention was embodied in U.S. Patent No. 6,464,107 B1, which had been issued on October 15, 2002.  Compl. ¶ 11.  It covers a dual chamber dispensing device that custom-blends two fluids by rotating the device's dispenser head.  *Id.* ¶ 12.  Such blending allows a user to select various formula strengths for the substance contained within the device.  According to Variblend, it enables the production of an "innovative lip gloss dispenser that

---

[1] The facts related herein are drawn from Variblend's complaint ("Compl.") (Dkt. 1); the Declaration of Andrew W. Goldwater in support of the motion to dismiss ("Goldwater Decl.") (Dkt. 6) and attached exhibits; the Declaration of John G. Hewson in opposition to the motion to dismiss ("Hewson Decl.") (Dkt. 10); and the parties' joint declaration of stipulated facts ("Stipulation") (Dkt. 8), requested by the Court at its June 12, 2013 conference with the parties.

2

allows the user to control the color or shade of the gloss by varying the proportions of two shades or colors pumped from two chambers." *Id.* ¶ 1.

The Agreement stated that Seidel would manufacture for Versadial sub-assemblies "substantially in accordance with the Specifications as provided by [Versadial]." Agreement § 2.1. It also prohibited Seidel from manufacturing any variable dual chamber dispensary device competitive with the one contemplated by the Agreement for any other person or entity, during the term of the Agreement and for two years thereafter. *Id.* In turn, Versadial was to purchase its requirements for these parts from Seidel, and would provide to Seidel specifications, assembly line equipment, and molds to be used by Seidel in production. *Id.* § 2.2. Versadial would also license its intellectual property rights to Seidel. *Id.*

### 3. Performance and Termination

During the first half of 2009, Seidel manufactured lipstick dispenser sub-assemblies pursuant to the Manufacturing Agreement. Stipulation ¶ 4. It sold these sub-assemblies to Versadial, which in turn sold them to Avon Products, Inc. ("Avon"). *Id.* For a short period of time in 2009, Avon, a major cosmetics company, sold the product as SpectraColor lipstick. Compl. ¶ 1.

Disputes subsequently arose between Versadial and Seidel. Stipulation ¶ 4. Each party sent to the other a notice of termination of the Agreement, asserting a different basis for termination and a different termination date. Versadial's notice was dated April 28, 2009, *see id.* Ex. 4, and Seidel's was dated December 10, 2009, *see id.* Ex. 3.

### 4. Assignment to Variblend

On August 10, 2012, Versadial entered into an Assignment and Release Agreement with Variblend. *See id.* Ex. 5. That document granted Variblend "all of [Versadial]'s right, title and

3

interest in and to [Versadial]'s assets, properties and rights, whether tangible or intangible, real or personal, and specifically including . . . the rights held by [Versadial] under that certain Manufacturing Agreement [with] Seidel." *Id.* at 1.  It did not, however, assign to Variblend any of Versadial's "obligations, duties or liabilities" under the Agreement. *Id.* § 1.2.

On August 31, 2012, Variblend sent a letter via email to Seidel, attaching a copy of the Assignment and Release Agreement between it and Versadial and stating that Variblend would seek to "aggressively pursu[e] ownership and possession of all assets held by [Seidel] that were paid for by Versadial." *See* Stipulation Ex. 6.  On November 16, 2012, Variblend's counsel in Germany sent another letter, again requesting equipment in Seidel's possession—specifically, an assembly table and production molds—and requesting that Seidel refrain from any and all further use of equipment and intellectual property belonging to Variblend or Versadial. *Id.* Ex. 8. In that letter, Variblend also asserted a claim for compensatory damages and indemnification with respect to third-party claims. *Id.* at 7.

On December 4, 2012, counsel for Seidel responded via letter. *See* Stipulation Ex. 10. Seidel objected to Variblend's request on various grounds, including that Variblend had not "explain[ed] the grounds for [its] property claim" and that, because Seidel had not approved the assignment to Variblend, as contemplated by the Agreement, Variblend "c[ould] not be owners of any rights stemming from the Manufacturing Agreement." *Id.* at 2.

Variblend asserts that it is "in the process of manufacturing and intends to introduce a 20 mm. lipstick dispenser similar to the Spectracolor lipstick previously sold by Avon." Compl. ¶ 21.  Variblend believes that Seidel "currently is using the molds and other equipment . . . built with the trade secrets disclosed to it by [Versadial], and information derived and developed from

4

those trade secrets, to manufacture its own lipstick product, which it intends or has begun to sell. That product will compete with the one that Variblend will soon introduce." *Id.* ¶ 22.

    **B. Procedural History**

On April 19, 2013, Variblend filed the Complaint. Dkt. 1. The Complaint alleges misappropriation of trade secrets and unfair competition. *See* Compl. *passim*. On June 6, 2013, Seidel filed a motion to compel arbitration of all claims asserted in the Complaint and to dismiss the action or, in the alternative, to stay it pending the outcome of arbitration, *see* Dkt. 4, and an accompanying memorandum of law in support of that motion, *see* Dkt. 5 ("Seidel Br."). On June 12, 2013, the Court held an initial conference with the parties. *See* Dkt. 7. On July 2, 2013, Variblend filed its opposition to Seidel's motion. Dkt. 9 ("Variblend Br."). On July 17, 2013, Seidel filed its reply. Dkt. 11 ("Seidel Reply Br."). On July 29, 2013, the Court received a letter from Variblend, asking the Court's leave to file a sur-reply in response to what it characterized as new arguments raised in Seidel's reply brief. Dkt. 12. Seidel opposed that request. *See* Dkt. 13. On July 30, 2013, the Court granted Variblend permission to file a sur-reply not to exceed five pages in length. *See* Dkt. 12. On August 5, 2013, Variblend filed its sur-reply. Dkt. 14 ("Variblend Sur-Reply").

**II.    Applicable Legal Standard**

    **A.    Relevant Legal Principles Under the Federal Arbitration Act**

The Federal Arbitration Act ("FAA") creates a body of federal substantive law establishing and governing the duty to honor agreements to arbitrate disputes. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625 (1985) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). The FAA was enacted to reverse "centuries of judicial hostility to arbitration agreements" and "to place arbitration agreements

'upon the same footing as other contracts.'" *Scherk v. Alberto Culver Co.*, 417 U.S. 506, 510–11 (1974) (citation omitted).

The Act accordingly provides that an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The Act is based on Congress's powers to regulate interstate commerce and admiralty. It applies to "any maritime transaction or a contract evidencing a transaction involving commerce." *Id.*; *see Southland Corp. v. Keating,* 465 U.S. 1, 10 (1984); *Prima Paint Corp. v. Flood & Conklin Mfg. Corp.*, 388 U.S. 395, 405 (1967).

Notwithstanding the strong "national policy favoring arbitration" evinced by Congress's enactment of the FAA, *see Southland*, 465 U.S. at 10, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Techs. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (citations omitted). Therefore, the FAA's presumption of arbitrability does not apply to the threshold issue of whether the parties entered into a binding agreement to arbitrate at all. *See Applied Energetics, Inc. v. NewOak Capital Mkts.*, *LLC*, 645 F.3d 522, 526 (2d Cir. 2011) ("[W]hile doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration, the presumption does not apply to disputes concerning whether an agreement to arbitrate has been made."); *Abram Landau Real Estate v. Bevona*, 123 F.3d 69, 72 (2d Cir. 1997). As a general matter, "[w]hen deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *see also Granite Rock of Chi. v. Int'l Bhd. of Teamsters,* 130 S. Ct. 2847, 2856–57 (2010); *Applied Energetics*, 645 F.3d at 526.

### B. The New York Convention

Also relevant where, as here, the agreement at issue is commercial and non-domestic, is Chapter 2 of the FAA, 9 U.S.C. §§ 201 *et seq.* Chapter 2 codifies the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 21 U.S.T. 2517, 330 U.N.T.S. 38 (Dec. 29, 1970), *reprinted at* 9 U.S.C. §§ 201 *et seq.* ("New York Convention" or "Convention").[2] *See Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 93 (2d Cir. 1999). The goals of the Convention (and thus of FAA chapter 2), were "to unify the standards by which agreements to arbitrate are observed" internationally, "to promote the enforcement of arbitral agreements in contracts involving international commerce so as to facilitate international business transactions," *id.* at 92 (internal quotation omitted), and "to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries." *Scherk*, 417 U.S. at 520 n.15.

Section 202 of the FAA delineates which disputes are covered by chapter 2:

> An arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention. An agreement or award arising out of such a relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states.

9 U.S.C. § 202. Applying Section 202, the Second Circuit has held that where an agreement or award "involv[es] parties domiciled or having their principal place of business outside [the U.S.]," that agreement or award falls within the Convention. *See Yusuf Ahmed Alghanim &*

---

[2] *See* 9 U.S.C. § 201 (providing for enforcement of the Convention); *id*. § 203 (providing that "[a]n action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States").

*Sons, W.L.L. v. Toys "R" Us, Inc.*, 126 F.3d 15, 19 (2d Cir. 1997) (citation omitted). The Second Circuit has also concurred with a sister circuit "that 'any commercial arbitral agreement, unless it is between two United States citizens, involves property located in the United States, and has no reasonable relationship with one or more foreign states, falls under the Convention.'" *Id.* (quoting *Jain v. de Méré,* 51 F.3d 686, 689 (7th Cir. 1995)), *cert. denied*, 516 U.S. 914 (1995)). *See also Smith/Enron*, 198 F.3d at 93 (for Convention to apply, arbitration agreement "cannot be entirely domestic in scope"); *Sphere Drake Ins. Ltd v. Clarendon Nat'l Ins. Co.*, 263 F.3d 26, 29 (2d Cir. 2001) (Convention applied where parties to agreement resided in two different countries—the United States and the United Kingdom); *cf. Indus. Risk Insurers v. M.A.N. Gutehoffnungshütte GmbH*, 141 F.3d 1434, 1441 (11th Cir. 1998).

The New York Convention supplies a limitation on the FAA's ordinary standard that state-law principles determine whether an arbitral contract has been formed. Under Article II, § 1 of the Convention:

> Each Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration.

New York Convention, 21 U.S.T. 2517, 330 U.N.T.S. 38, art. II, § 1; *see U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd.*, 241 F.3d 135, 146 (2d Cir. 2001). Article II, § 2 of the Convention, in turn, defines "an agreement in writing" as "an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters and telegrams." *Smith/Enron*, 198 F.3d at 93; *see generally Kahn Lucas Lancaster, Inc. v. Lark Int'l Ltd.*, 186 F.3d 210, 216–18 (2d Cir. 1999), *partially abrogated on other grounds by Sarhank*

*Group v. Oracle Corp.,* 404 F.3d 657, 660 n.2 (2d Cir. 2005) (construing the "agreement in writing" requirement).

        **C.**     **Availability of Summary Judgment**

A final background principle relevant here is that the issue of contract formation under the FAA may often be resolved at the threshold of the case, by the Court.

Section 4 of the FAA provides that "if the making of the arbitration agreement . . . be in issue, the [district] court shall proceed summarily to the trial thereof." 9 U.S.C. § 4 (providing for right to jury trial in such circumstances). However, for the existence of an arbitral agreement to be "in issue" so as to necessitate a trial, there must be a genuine issue of disputed fact that is material to that issue; it is not enough for the parties to assert different legal conclusions based on common facts. *See, e.g.*, *Oppenheimer & Co., Inc. v. Neidhardt*, 56 F.3d 352, 358 (2d Cir. 1995) (district court acted properly in granting motion to compel arbitration on submitted papers, without trial). As the Second Circuit has explained, "[i]n the context of motions to compel arbitration brought under the [FAA], the court applies a standard similar to that applicable for a motion for summary judgment." *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003); *see also Sphere Drake Ins. Ltd.*, 263 F.3d at 30; *U.S. Titan, Inc.*, 241 F.3d at 145–46 (approving district court's finding of an arbitration agreement, without evidentiary hearing, where parties made extensive evidentiary submissions; the fact that parties differed "over the meaning" of the decisive telex and facsimile communications did not require trial); *Glencore Ltd. v. DeGussa Engineered Carbons L.P.*, 848 F. Supp. 2d 410, 424 (S.D.N.Y. 2012) (where parties "rel[ied] entirely on documentary evidence," all such evidence had been submitted to the Court, and dispute concerned "whether . . . [the] communications together establish[ed] an agreement to arbitrate," dispute was suitable for "resolution at the threshold" by the Court).

Here, where there is no issue of disputed fact requiring trial, summary judgment is appropriate. As Variblend argues—and Seidel appears not to dispute—the relevant facts are not in dispute. The parties have stipulated to the existence of an agreement between Versadial and Seidel, *see* Stipulation ¶ 2, have provided the Agreement to the Court, and no party has asserted that Variblend was a signatory to that Agreement. The parties instead dispute, as a matter of law, whether the Agreement's arbitration provision binds Variblend. This is precisely the type of issue that is appropriate for the Court to resolve at the threshold. The Court therefore does so here.

### III. Discussion

#### A. Applicability of New York Law

The parties dispute what law applies to the issue whether they have in fact entered into an agreement to arbitrate. The Court begins by addressing that question.

Seidel argues that the FAA and federal common law apply here. To decide that a claim is subject to arbitration under the FAA and Chapter 2, four elements must be established: "(1) there must be a written agreement; (2) it must provide for arbitration in the territory of a signatory of the convention; (3) the subject matter must be commercial; and (4) it cannot be entirely domestic in scope." *Smith/Enron Cogeneration*, 198 F.3d at 92. Because there is a written agreement here providing for arbitration in Geneva, Switzerland (which is a signatory to the Convention), *see* Declarations and Reservations, Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 21 U.S.T. 2517, 330 U.N.T.S. 38 (Dec. 29, 1970), Seidel argues, the first two elements are met. The subject matter of the dispute is indeed commercial, arising as it does out of a dispute between a manufacturer and a seller regarding a contract and the assignment thereof, as well as claims of misappropriation of trade secrets and

unfair competition. Finally, the dispute is not entirely domestic in scope: It involves a German company and a contract which involved conduct occurring in Germany. Because the requirements of the New York Convention are met here, Seidel asserts, the Court is required to "direct that arbitration be held in accordance with the agreement." 9 U.S.C. § 206.

Variblend, however, disputes that such an agreement exists as to it. Variblend points out that it did not sign the Agreement containing the arbitration clause—Versadial did. Because Variblend was not a party to the Agreement, it argues, the Court must determine whether it is bound to arbitrate by first applying state law principles of contract formation. In Variblend's view, New York contract law governs this threshold determination.

The Court agrees. The statutory presumption of arbitrability and the federal common law arising under the New York Convention do not apply to the threshold question whether a party even agreed to arbitrate in the first instance. The statutory presumption favoring arbitration applies "*only* where it reflects, and derives its legitimacy from, a judicial conclusion that arbitration of a particular dispute is what the parties intended because their express agreement to arbitrate was validly formed." *Glencore*, 848 F. Supp. 2d at 421 (emphasis in original) (quoting *Granite Rock*, 130 S. Ct. at 2859.). And to reach such a conclusion, courts must, as Variblend emphasizes, "apply ordinary state-law principles that govern the formation of contracts." *First Options*, 514 U.S. at 944; *accord Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 475 (1989); *Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987); *Applied Energetics*, 645 F.3d at 526; *Mehler v. Terminix Int'l Co. L.P.*, 205 F.3d 44, 48 (2d Cir. 2000).

Before it is determined whether the New York Convention applies to this case, therefore, the Court must analyze whether, under New York contract law,[3] Variblend is bound by the Agreement.

### B. Application of New York Law

Under New York law, an arbitration clause is generally held to apply to the assignee of a contract. *See Lipman v. Haeuser Shellac Co., Inc.*, 289 N.Y. 76, 81 (1942) ("[T]he arbitration clause is an integral part of the contract and may be availed of, not only by the original parties but also by assignees."); *Tanbro Fabrics Corp. v. Deering Milliken, Inc.*, 318 N.Y.S.2d 764, 766 (1st Dep't 1971) ("[T]he assignee of a contract acquires the rights of the assignor therein and assumes its obligations including an agreement to arbitrate."); *Blum's, Inc. v. Ferro Union Corp.*, 318 N.Y.S.2d 414, 415 (1st Dep't 1971), *aff'd*, 29 N.Y.2d 689 (1971) ("An assignee who has taken over the rights of an assignor is bound to an arbitration clause in the assigned contract."); *In Re Lowenthal*, 191 N.Y.S. 282, 285 (1st Dep't 1921) ("It seems to us that, where a contract is assignable, the arbitration clause is an integral part thereof, and may be availed of by either party to the contract or by his legal representatives or assigns. . . . If the arbitration clause of an assignable contract of sale is not available, except as to the parties to such a contract, it would then be a simple matter, if either party sought to escape the effect of such a clause, to assign the contract to a third party.").

---

[3] No party has urged that the law of any other state governs here; rather, the dispute is whether the Court should apply federal common law under the FAA or the contract law of New York state, where Versadial had its principal place of business and whose law the Manufacturing Agreement stated would govern. *See* Agreement § 16.2 ("The Parties agree that this Agreement shall be exclusively governed by and interpreted and construed in accordance with the substantive internal laws of the State of New York, United States of America, excluding all conflicts of laws principles."); *cf.* Variblend Br. 6–8 (citing, *inter alia*, *Motorola Credit Corp. v. Uzan*, 388 F.3d 39 (2d Cir. 2004)).

Variblend argues, however, that because it was assigned all of Versadial's assets but disclaimed "any obligations, duties, or liabilities" of Versadial, it is not bound by Versadial's duty to arbitrate. Variblend relies on the Second Circuit's opinion in *Lachmar v. Trunkline LNG Co.* for the proposition that an assumption of rights, but not of obligations, liberates an assignee from the duty to arbitrate. In that case, the Second Circuit, applying New York law, held:

> Under New York law, made applicable by the parties, the assignee of rights under a bilateral contract is not bound to perform the assignor's duties under the contract unless he expressly assumes to do so. Included among the duties to which this rule has reference is the duty to arbitrate.

753 F.2d 8, 9–10 (2d Cir. 1985) (citations omitted). *See also Gruntal & Co., Inc. v. Ronald Steinberg*, 854 F. Supp. 324 (D.N.J. 1994); *United States v. Panhandle E. Corp.*, 672 F. Supp. 149 (D. Del. 1987); *Kaufman v. William Iselin & Co., Inc.*, 74 N.Y.S.2d 23 (1st Dep't 1947).

This Court, however, does not interpret *Lachmar* and its progeny as broadly as Variblend does. The Court instead shares the analysis of Judge Buchwald, who has convincingly explained that "*Lachmar*'s analysis and its facts are limited to cases where factors are 'passive,' i.e. sued or joined as a third-party." *GMAC Commercial Credit LLC v. Springs Indus., Inc.*, 171 F. Supp. 2d 209, 215 (S.D.N.Y. 2001) (Buchwald, J.). Significantly, the party that the *Lachmar* court found had not assumed the duty to arbitrate had "neither sought nor was implicated in the relief at issue in the arbitration." *Id.* As Judge Buchwald further noted, the *Kaufman* case relied upon by the *Lachmar* court also involved a situation in which the defendant assignee had not sought to enforce his rights under the contract. *Id.*; *see also GMAC v. Dillard Dep't Stores*, 198 F.R.D. 402, 407–08 (S.D.N.Y. 2001) (citing *Kaufman*'s "important limiting language" to the effect that its holding was limited to "a situation where the assignee ha[d not] taken any affirmative action under the contract to enforce its terms" and that, in a situation where the assignee had taken such action, "it is proper to hold that having taken steps to adopt the terms of the contract[, the

13

assignee] had assumed the obligations as well as the rights thereunder" (citation omitted)). By contrast here, of course, Variblend affirmatively seeks legal relief. It has sued its assignor's contractual counterparty, Seidel, seeking to enforce the rights that it claims to have assumed from Versadial, including rights against Seidel that arose from the agreement between Versadial and Seidel.

*Lachmar* is also inapposite for another reason. There, the defendant seeking to compel arbitration had consented to the assignments in a written agreement which stated that the assignment did not impose obligations or liabilities. Here, by contrast, neither party claims that Seidel consented to Variblend's assignment. *See* Hewson Decl. ¶ 6 ("To my knowledge, Variblend never asked Seidel to consent to the Versadial-Variblend Assignment and Release Agreement, and Seidel stated its refusal to recognize any assignment of rights from Versadial to Variblend in its lawyer's letter of December 4, 2012."); Stipulation Ex. 10 ("[Versadial] did not at any time request . . . my client's approval, let alone my client having granted [*sic*] such approval."). Where such consent has been given, there is good reason to hold the defendant to its release of plaintiff from the arbitration provision. But Seidel did not agree to any such release. To allow the assignment of rights to a third party to vitiate an arbitration agreement between the original parties, where the agreement provided that it bound assignees and where the assignment was unconsented to by the non-assigning party, would provide an unjustified end-run around a validly-entered arbitration agreement.

The other cases applying New York law cited by Variblend are also rightly distinguished. In *United States v. Panhandle Eastern*, the court held that the duty to arbitrate had not been assumed, but it found it "significant[]" that the party seeking to compel arbitration had consented to the assignment and its terms. *See* 672 F. Supp. 149, 154 (D. Del. 1987). And both First

14

Department cases that Variblend cites, *see* Variblend Br. 11, present situations factually distinct from this one. Variblend's role in this case is qualitatively different from that of a guarantor, like petitioners in *Calvin Klein Co. v. Minnetonka, Inc. See* 449 N.Y.S.2d 729, 731 (1st Dep't 1982) ("In the absence of a specific agreement to arbitrate, the guarantors of a principal agreement containing an arbitration clause cannot be compelled to arbitrate."). As to the second case, *Rosenthal & Rosenthal, Inc. v. John Kunstadt, Inc.*, 482 N.Y.S.2d 287 (1st Dep't 1984)—as the Court in *GMAC Commercial Credit, LLC v. Dillard Dep't Stores* pointed out—it failed to incorporate *Kaufman*'s "important limiting language . . . in the . . . decision," 198 F.R.D. 402, 408 (S.D.N.Y. 2001) (Motley, J.); *see also id.* ("[T]his court believes th[at] omission was in error.").

Variblend's having disclaimed Versadial's "obligations, duties, [and] liabilities" does not change the fact that Variblend is seeking to enforce rights it assumed under Versadial's former contract with Seidel. Although Variblend contends that it "has not asserted any claim for breach of the agreement in its complaint," Variblend Sur-Reply 2, the Agreement is the operative document underlying—and is fundamental to—Variblend's suit. Variblend is correct that the "Agreement did not confer the trade secret rights that Variblend asserts; it is simply evidence of the steps taken to protect the trade secrets, of their value, and of Seidel's acknowledgement." Variblend Sur-Reply Br. 3. But Variblend ignores much of the substance of the Agreement, which explains, for example, how Seidel came to possess the materials which Variblend now seeks to recoup from Seidel. *See* Compl. ¶ 32(D). Variblend seeks not merely to recover the monetary compensation to which it believes, under the Agreement, it is entitled, but also asks the Court to order Seidel to return information previously provided by Versadial and to refrain from using the intellectual property rights Variblend purports to now own. Put another way,

Variblend seeks to step into Versadial's shoes, vis-à-vis the Agreement, while simultaneously removing the arbitration provision that was a material element of that Agreement. That it cannot do.

Rather, as Judge Buchwald aptly put the point in *Springs*, it is "elementary ancient law that an assignee never stands in any better position than his assignor. An assignee is subject to all the equities and burdens which attach to the property assigned because he receives no more . . . than his assignor." 171 F. Supp. 2d at 215; *see also Sea Spray Holdings, Ltd. v. Pali Fin. Grp., Inc.*, 269 F. Supp. 2d 356, 362 (S.D.N.Y. 2003) ("As an assignee, [plaintiff] is not entitled to any more rights than [assignor] because [assignor] cannot convey . . . an interest greater than that which it possessed. . . . This principle applies under New York law even when the restriction at issue is a commitment to arbitrate."); *Richard T. Blake & Assocs., Inc. v. Aetna Cas. & Sur. Co.*, 681 N.Y.S.2d 73, 75 (2d Dep't 1998) ("It is well established that an assignee stands in the shoes of the assignor and takes the assignment subject to any pre-existing liabilities."). Versadial could not assign to Variblend rights that it did not have. Variblend therefore is bound by the Agreement's remedial provision requiring arbitration of disputes, notwithstanding its attempt to disclaim arbitration as an obligation, duty, or liability which it did not assume from Versadial.

### C. Federal Common Law and U.C.C. Principles

In any event, even if the Court were to find that federal common law, rather than New York law, applies to the question whether Variblend assumed a duty to arbitrate, the result would be the same. "[T]he case law supports the basic principle that an assignee or other party whose rights are premised on a contract is bound by the remedial provisions bargained for between the original parties to the contract." *Banque de Paris et des Pays-Bas v. Amoco Oil Co.* (*Paribas*),

16

573 F. Supp. 1464, 1469 (S.D.N.Y. 1983) (Sofaer, J.). Under federal law, "[t]o determine the circumstances under which the obligations of an arbitration agreement will extend to a nonsignatory and to what extent, we look to the federal common law of contracts, for which the Uniform Commercial Code provides guidance." *Id.* (collecting cases). The U.C.C.

> makes explicit . . . that the rights of an assignee are subject to . . . all the terms of the contract between the account debtor and assignor and any defense or claim arising therefrom. This principle applies to arbitration provisions, which would be of no value if a party could escape the effect of such a clause by assigning a claim subject to arbitration between the original parties to a third party. *Even an assignment only of contract 'rights' not entailing any duty of performance . . . must be deemed to include the bargained-for remedial procedure.*

*Id.* at 1470 (citations omitted) (emphasis added); *see also Springs*, 171 F. Supp. 2d at 214 ("[I]n interpreting U.C.C. 9–318(1), courts have held that arbitration is a contractual *remedy*, not an *obligation*, and cannot be abrogated through a finance assignment. The adoption of . . . Article 9 of the U.C.C. means that a finance assignee suing on an assigned contract is bound by that contract's arbitration clause unless it secured a waiver from the signatory seeking to arbitrate.") (citations omitted) (emphasis in original).[4]

Thus, if federal common law governed the threshold question here, Variblend would still be bound by the arbitration provision contained in the Agreement between Versadial and Seidel.

---

[4] New York's adoption of the U.C.C. further undercuts Variblend's argument based on the *Lachmar* line of cases. *See Sea Spray Holdings*, 269 F. Supp. 2d at 362 ("New York's adoption of the U.C.C., specifically, Article 9, means that a finance assignee suing on an assigned contract is bound by that contract's arbitration clause unless it secured a waiver from the signatory seeking to arbitrate." (citation omitted)); *Springs*, 171 F. Supp. 2d at 213–14 ("The New York common law principle that arbitration was an 'obligation' not assumed by a finance assignee was superseded by New York's adoption of the Uniform Commercial Code . . . provision 9–318(1) in 1964."); *Paribas*, 573 F. Supp. at 1470 ("Under the Code . . . and in New York where the UCC has been adopted, an assignee is entitled to enforce an arbitration clause as one of the rights acquired by assignment, and may likewise be forced to arbitrate." (citations omitted)).

17

### D. The Agreement's Arbitration Provision

There appears to be little dispute between the parties that, if Variblend is so bound, the arbitration provision in the Agreement encompasses the dispute here. *See* Variblend Br. 5 ("The issue here is not the scope of the arbitration clause . . . but whether Variblend agreed to it."). Nor could there be: The Agreement states that

> any dispute or disputes arising between the Parties out of or in connection with this Agreement (including its interpretation, closing, execution, binding effect, amendment, breach, termination or enforcement) which cannot be settled through correspondence and mutual good faith consultation of the Parties hereto, shall be finally settled by binding arbitration in accordance with the rules and procedure of the International Chamber of Commerce (the "ICC") . . . . The arbitration shall take place in Geneva, Switzerland. The arbitration or arbitrators, as applicable, shall be chosen in accordance with the procedures of the ICC. . . . The award in any such arbitration shall be conclusive and binding upon the Parties . . . .

Agreement § 16.4. This broad arbitration provision covers the dispute here, which arises "out of or in connection with th[e] Agreement."

In any event, all four *Smith/Enron* factors, as discussed *supra* at Section III.A, have been met, meaning that, with its having been determined that the provision applies to Variblend, any questions as to the scope of the arbitration provision or the arbitrability of particular disputes are, in such a situation, properly committed to arbitration. *See VRG Linhas Aereas S.A. v. MatlinPatterson Global Opportunities Partners II L.P.*, 717 F.3d 322, 326 (2d Cir. 2013) ("[A]n arbitration clause subjecting disputes to the rules and procedures of the ICC International Court of Arbitration clearly and unmistakably commits to arbitration any questions about the arbitrability of particular disputes."); *Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 124–25 (2d Cir. 2003) ("[B]ecause the parties' arbitration agreement is broadly worded to require the submission of 'all disputes' concerning the Representation Agreement to arbitration, and because it provides for arbitration to be conducted under the rules of the ICC, which assign the arbitrator

18

initial responsibility to determine issues of arbitrability, we conclude that the agreement clearly and unmistakably evidences the parties' intent to arbitrate questions of arbitrability.").

### E.  Seidel's Estoppel and "Successors and Assigns" Arguments

Having found that Variblend is bound by the arbitration provision in the Agreement, the Court has no occasion to address Seidel's alternative arguments that Variblend is estopped from refusing to arbitrate because it has sought direct benefits from the Agreement, *see* Seidel Reply Br. 8–10, or that Variblend is bound by the Agreement as a "successor" and an "assign" of Versadial, *see* Seidel Reply Br. 10. [5]

## CONCLUSION

For the foregoing reasons, Seidel's motion to compel arbitration is granted.  The case is stayed pending the outcome of arbitration before the ICC.[6]  The parties are directed to submit a joint status letter to the Court, apprising it as to the status of arbitration proceedings, every 90 days from the date of this Opinion.

The Clerk of Court is respectfully directed to terminate the motion pending at docket number 4, and to place this case on the suspense docket.

---

[5] To cure any prejudice resulting from the fact that these arguments were first raised—at least in a technical sense—in Seidel's reply brief, the Court gave Variblend the opportunity to submit a sur-reply of five pages, exceeding by three pages the length actually devoted to these arguments in Seidel's reply brief.  Although the Court does not reach these arguments, the Court does not view them as foreclosed by Seidel's failure, from Variblend's perspective, to raise them in its opening brief.

[6] The Court has concluded that a stay, rather than a dismissal of this case, is appropriate here, in order to "promote expeditious resolution of this dispute."  *See Pick Quick Food, Inc. v. United Food & Commercial Workers Local 342*, No. 13-CV-1391 (JFB)(GRB), 2013 WL 3466451, at *11–12 (E.D.N.Y. July 10, 2013) (discussing the implications "for the speed with which the arbitration of the dispute may begin" of staying versus dismissing a case where a court has determined that the issue is referable to arbitration; collecting cases); *see also Salim Oleochemicals v. M/V Shropshire*, 278 F.3d 90, 93 (2d Cir. 2002) (when deciding whether to dismiss or stay an action, district courts should "be mindful of th[e] liberal federal policy favoring arbitration agreements" (citation omitted)).

SO ORDERED.

                                                        *Paul A. Engelmayer*
                                                    PAUL A. ENGELMAYER
                                                    United States District Judge

Dated: August 27, 2013
          New York, New York